[No. 29842.   Department Two.   June 21, 1946.]

THE STATE OF WASHINGTON, *Appellant,* v. HENRY PORTEE, *Respondent.*[1]

[1] Reported in 170 P. (2d) 326.

*Lloyd Shorett* and *John L. Vogel,* for appellant.

*Russell F. Stark,* for respondent.

ROBINSON, J.—In this action, the defendant was charged with grand larceny. The trial court, at the close of the state's evidence, granted a motion for a directed verdict, and the case is here on the state's appeal. The respondent has moved to dismiss.

The state asserts its right to appeal by virtue of the provisions of Rem. Rev. Stat., § 2183-1 [P.P.C. § 5-3], and specifically by that portion thereof which we italicize in quoting that section:

"The state may have a right of appeal to the supreme court, upon giving the same notice as is required of other parties, when the error complained of is based on the following: (1) The setting aside of an indictment or information; (2) The sustaining of a demurrer to an indictment or information; (3) An order arresting judgment on any grounds; (4) An order granting to anyone, convicted by a jury, a new trial on any grounds; (5) *Any order which in effect abates or determines the action, or discontinues the same, otherwise than by an acquittal of the defendant by a jury:* Provided, That in no case shall the state have a right to an appeal where the defendant has been acquitted by a jury."

Respondent questions the constitutionality of the statute. We will not discuss that point, since, in a recent case heard by the court sitting *En Banc,* it was held to be constitutional in an opinion in which all of the then judges of this court concurred. *State v. Brunn,* 22 Wn. (2d) 120, 154 P. (2d) 826.

It will be noted that the legislature, in enacting § 2183-1, was careful, even to the point of redundancy, to provide that the state should not have the right to the appeal granted therein when a defendant has been acquitted "by a jury." This fact immediately suggests the question: Was the defendant in this case acquitted "by a jury?" It is true that the jury returned a verdict of not guilty, but it

did so at the direction of the court. In obeying the court's direction, it passed upon no issue of fact and exercised no element of discretion or decision. It merely performed a ministerial act.

It seems to us, and we so hold, that a verdict of acquittal, directed by the trial judge, is, in effect, an acquittal by the trial judge himself. If authorities to that effect be required, they are numerous. The state's brief calls our attention to the following pertinent quotations from opinions rendered by courts of other states:

"When a verdict is directed by the court, the jury is bound to render the verdict as directed. In such instance the court alone determines the case." *Smalley v. Rio Grande Western R. Co.*, 34 Utah 423, 98 Pac. 311.

"The direction to render a verdict in favor of one party is the decision by the court upon a question of law. . . . In giving a verdict upon such an order the jurors do not exercise discretion, but act ministerially as the instrument by which the court prepares the record." *Estate of Sharon*, 179 Cal. 447, 177 Pac. 283.

"A motion to direct a verdict is in effect a demurrer to the evidence and entirely under the control of the court. . . . When the court directs a verdict it in effect takes the case from the jury and molds the verdict itself." *Cook v. American Smelting & Refining Co.*, 99 N. J. L. 81, 122 Atl. 743.

"The verdict, though in form the act of the jury, is really the act of the court. The court determines the case. The verdict of the jury is merely a form of putting of record the judgment which the court has given." *Curran v. Stein*, 110 Ky. 99, 60 S. W. 839.

"The only appreciable difference is that in the one the court, upon a given state of facts which in his opinion does not entitle the plaintiff to a recovery as matter of law, directs the clerk to enter a nonsuit; while in the other, upon the same facts and entertaining the same opinion, he rightly asserts positive control over the consciences of the jury by directing and requiring them to find a verdict for the defendant. To call or regard a verdict so rendered a determination of the facts by a jury in any just sense, is a palpable misnomer and a legal absurdity." *Ordway v. Boston & M. R.*, 69 N. H. 429, 45 Atl. 243.

The order appealed from is as follows:

"THIS MATTER having come on for hearing this 3rd day of December, 1945, at the close of the State's case, upon the motion of the Defendant for a Directed Verdict of Acquittal, for the reason that the evidence produced by the State of Washington is insufficient, the Court having heard and examined all of the evidence (the Defendant having introduced none) and the arguments of counsel and it appearing to the Court that the State of Washington has not produced sufficient evidence to prove the crime charged,

"IT IS NOW THEREFORE ORDERED, ADJUDGED and DECREED, that the Defendant's Motion for a Directed Verdict be granted and that the Jury be and it hereby is directed to return a Verdict of Acquittal for the Defendant.

"THE PLAINTIFF, STATE OF WASHINGTON, excepts to each and every part of the above Order."

In our opinion, an appeal from this order is clearly authorized by the terms of Rem. Rev. Stat., § 2183-1, hereinabove quoted. Its effect was to determine and discontinue the action. The motion to dismiss the appeal is, therefore, denied.

The question before us on the merits is whether the ordinary, reasonable man could, on the evidence produced by the state, believe the defendant guilty beyond a reasonable doubt, as that term would have been properly defined in the instructions of the trial court, had the case been sent to the jury. If the ordinary, reasonable man could so believe, the trial court erred in taking the case from the jury; for it must be kept in mind that the state, as well as the defendant, had the right to jury trial. Reduced to its lowest terms, the question is: Did the state's evidence make out a *prima facie* case?

Six witnesses testified on behalf of the state, and four exhibits were introduced. The salient points in the evidence may be stated in narrative form as follows:

On September 17, 1945, Jeanette Pahl arrived in Seattle, by train, and temporarily left her baggage, consisting of eight pieces, in storage at the railroad depot. At noon on September 21st, she claimed the eight pieces of baggage. The railway checks were removed, and the checks of the

Seattle Transfer Company substituted therefor, on each of the eight pieces. The depot supervisor for that company testified that he immediately placed the baggage on the company's loading dock, which was accessible to persons other than employees of the railroad or of the transfer company. When delivery of the baggage was made at Miss Pahl's residence, 1505 north 43rd street, at 2:30 p. m. that afternoon, a suitcase containing about two hundred dollars' worth of clothing was missing.

A day or two thereafter, the defendant was arrested on a charge wholly disconnected with this case. A pawn ticket, No. 66727, was found among his personal effects which indicated that he had pawned a suitcase at the Empire Loan Company on September 21st. On September 27th, Officer Davis, of the detective division of the Seattle police force, sent Officers Madden and Colfelt to Miss Pahl's residence, with directions to escort her to the Empire Loan Company to examine the article represented by the pawn ticket. She identified it at the loan company's office as her missing suitcase, and again so identified it in court.

Lewis Crystal, manager of the Empire Loan Company, testified that the suitcase was pawned at his place of business, 1206 First avenue, Seattle, on September 21st, and that he personally handled the transaction. He identified the pawn ticket which was found in respondent's possession. This ticket, which is in evidence as an exhibit, was the loan company's No. 66727. Crystal also brought with him, and identified, a half page from the pawn book which is kept as the pawnshop's own record and for inspection on demand by the police. This page is dated September 21, 1945, and was also admitted as an exhibit in the case. It is the record of a dozen such transactions made on September 21, 1945.

In each instance, at the right of the page, is a brief description of the article pawned, and, at the left, the number of the ticket issued. Between these, in the middle of the page, are a number of blanks to be filled out. In this instance, the article pawned is described as "Brown Suitcase, Red Binding." The number of the ticket issued in the transaction is recorded as No. 66727. The first of the blanks in the

middle of the page calls for the pawnor's name, and this he is required to supply in his own handwriting. In this instance, the name written in the blank is "Jame Hermon." His address is given in the same handwriting as "Fremon Hotel." The rest of the blanks are filled out by the lender, and, in this instance, it is recorded that the borrower was a negro about thirty-two years old, five feet eight inches tall, and weighing about one hundred fifty pounds. Finally, there is a statement of the amount loaned, which was ten dollars. Mr. Crystal further testified that the suitcase was worth about forty dollars.

On September 28th, the day following the identification of her suitcase by Miss Pahl, Officer Davis took a written statement from the defendant, which was offered in evidence and admitted without objection and thereupon read to the court. We quote from the original exhibit:

"My true name is Henry Portee. Am 30 years old, single and have been living with two other boys in Room 56, Rex Hotel, since I came to Seattle on September 17, 1945. On September 21, 1945, while I was in the Greenland Tavern, a colored man came to me and offered me a suitcase for $4.00. That he needed the money to get his wife out of jail. I gave him the $4.00, and then we went to a pawn shop on 1st Avenue where I pawned it for $10.00. He was about 25 years old, 5 ft. 5 in. tall and about 140 pounds, dark brown skinned negro. After pawning the suitcase, he came to the City Jail with me, but he was not permitted to see his wife. We both went back to the Greenland Tavern. He left me there and I have never seen him since.

"This is a true and voluntary statement made by me knowing that it may be used against me.

[Signed] Henry Portee

Wit.
Investigating Officers
John F. Holland                    . Det. Lt. N. D. Davis"

In ruling upon the defendant's motion for a directed verdict at the close of the state's case, the trial judge observed that he had not had time, during the noon hour, to consider all of the cases of grand larceny found in our state reports, but had examined quite a number and had found case after case holding that possession of stolen property is proper

evidence to be considered by the jury in connection with other evidence establishing the guilt of the defendant, "but not when possession alone is relied upon." He thereupon granted defendant's motion for a directed verdict.

We think it can be safely said that the most thorough and exhaustive search of our two hundred twenty-three volumes of reports would not reveal a decision holding that mere proof of possession could establish a *prima facie* case; for as early as 1893, in the case of *State v. Humason*, 5 Wash. 499, 507, 32 Pac. 111, this court said that "bare possession of recently stolen property alone is not sufficient to justify a conviction." Furthermore, during the same year, the court held, in *State v. Walters*, 7 Wash. 246, 34 Pac. 938, 1098, that proof of possession of stolen property does not raise a presumption of law which a defendant is required to introduce evidence to rebut. It was held in that case:

"Any presumption that may be drawn from such possession is a presumption of fact merely; in other words, it is only an inference that one fact may exist from the proof of another."

That holding has been reaffirmed in *State v. Bliss*, 27 Wash. 463, 68 Pac. 87; *State v. Eubank*, 33 Wash. 293, 74 Pac. 378, and *State v. Costello*, 144 Wash. 425, 258 Pac. 29.

The few courts in other jurisdictions which hold that mere possession is sufficient to make out a *prima facie* case have been misled by inaccurate usage of the term "presumption." We quote from 1 Wharton's Criminal Evidence (11th ed.) 198, § 191:

"LARCENY AND BURGLARY; POSSESSION OF STOLEN GOODS. With the discussion of the presumption arising from the possession of stolen goods, the looseness of phraseology must again be deplored which assigns one term, 'presumption,' to processes so very different as fictions, presumptions of law, and inferences. Of the confusion which thus arises, the 'presumption' now before us is the most striking illustration. It is really an inference of fact, but frequently, from the notion that inferences and presumptions of law are convertible, it has been declared to be a presumption of law. But the difference will at once be seen by recurring

to the distinct processes of reasoning which are thus invoked. The presumption of law, granting its minor premise, establishes a certainty. It says, for instance: "All persons under seven years are presumed incapable of crime; A is under seven years; he is therefore incapable of crime.' If A is under seven years, then the conclusion is a certainty, and the jury must be directed so to find. This, in fact, is deductive reasoning, in which the major premise is matter of law, and in which all that remains to the jury is to find as to the truth of the minor premise. But in inferences such as these the process is inductive, and neither major nor minor premise is a matter of law. Thus, in the case of the inference from receiving stolen property, the reasoning is as follows: 'The proportion of guilty persons holding stolen goods to innocent ones is two to one; A holds stolen goods; therefore the probability of his guilt is two to one.' Now, as to this process, it is to be remarked: (1) That the major premise is a statement which is of no value unless it is based upon a large observation of facts; (2) that the conclusion is only a probability; and (3) that no case arises in which the question comes up pure and simple, for in all cases the fact of possession is mixed with some other qualifying fact or inference. Taking up, then, the immediate point, it may be said that a court may properly tell the jury that the possession by a party of stolen goods is a fact from which his complicity in the larceny may be inferred. But the possession must be personal, recent, and unexplained, and must involve a distinct and conscious assertion of property by the defendant. If the explanation involves a falsely disputed identity or other fabricated evidence, the inference increases in strength. . . .

"Mere possession of stolen goods, unaccompanied by other evidence of guilt, is not to be regarded as prima facie evidence of burglary. *But the rule is otherwise when there is indicatory evidence on collateral points."* (Italics ours.)

The general nature of this so-called "indicatory evidence on collateral points" is suggested by the following section in 4 Nichols on Applied Evidence 3664, § 29:

"SUFFICIENCY IN CONNECTION WITH OTHER EVIDENCE. Possession of recently stolen property, in connection with other evidence tending to show guilt, is sufficient to warrant a conviction. When a person is found in possession of recently stolen property, slight corroborative evidence of other inculpatory circumstances tending to show his guilt

will support a conviction. When the fact of possession of recently stolen property is supplemented by the giving of a false or improbable explanation of it, or a failure to explain when a larceny is charged, or the possession of a forged bill of sale, *or the giving of a fictitious name,* a case is made for the jury." (Italics ours.)

█ In our opinion, the court erred in directing a verdict in the instant case. The state did not rely upon possession alone. Other circumstances were shown. As we have hitherto seen, the state produced evidence that the suitcase was purloined some time in the afternoon of September 21, 1945, and that defendant pawned it as his own that same afternoon, (1) giving a fictitious name and (2) a false address, and, after these facts were discovered, (3) an explanation of a kind that could not be checked or rebutted, and (4) one that a jury could regard as improbable.

These circumstances, we think, are of the kind Mr. Wharton had in mind when, as shown in a foregoing quotation, he said that mere possession is not *prima facie* evidence of burglary; but the rule is otherwise where there is "indicatory evidence on collateral points." We further think that they are circumstances of the kind the author of the extensive note in 19 Am. & Eng. Ann. Cas. 1281 had in mind when he used the phrases "other incriminating circumstances" and "other guilty circumstances," in the following textual statement under the sub-heading, "Weight of Evidence in General":

"In prosecutions for burglary the possession of the stolen property is almost invariably accompanied by other incriminating circumstances, such as the character of the explanation of the possession, the secrecy of the possession, a denial of the possession, the presence of the accused near the scene of the crime, flight, etc.; and *it is generally held that proof of such possession, explained falsely or not reasonably, or accompanied by other guilty circumstances, is sufficient to carry the case to the jury and to support a conviction."* (Italics ours.)

We have examined the cases cited in support of the text quoted from Wharton's Criminal Evidence, and the cases cited in support of the quotation from Nichols on Applied Evidence, and a few of the some hundreds of cases cited in

the note last referred to, and in each instance they appear to support the author's conclusions. We think it unnecessary to cite or discuss those decisions, since our own decisions are clearly to the same effect.

In the same year (1893) in which this court held that possession alone did not make a *prima facie* case and did not raise a legal presumption (*State v. Humason* and *State v. Walters, supra*), the court had before it an appeal from a conviction of burglary. A merchant had in a safe in his store a sum of about eighty dollars, made up of gold and silver coin, and a ten, five, and a one dollar bill. The opinion says, in part:

"The money was gone from the safe in the morning, and from appearances the back window of the store had been raised during the night. These facts show that some one had broken and entered the building with intent to commit larceny therein, and, therefore, was guilty of burglary. Penal Code, § 46. . . .

"We have no doubt that the money appellant had tied up in a handkerchief and secreted at his mother's house, and which he produced and gave to the chief of police, was the same money which was taken from M. O'Connor's safe only a night or two previously. The amount given to the officer was about the sum that had been stolen, and corresponded with it in kind and denomination. What he said and did when he found he was accused of this offense, coupled with the extremely improbable explanation of how he obtained the money which he produced and turned over to the chief of police, showed his guilt beyond any reasonable doubt whatever." *State v. Munson,* 7 Wash. 239, 241, 34 Pac. 932.

In *State v. Rathbun,* 139 Wash. 502, 247 Pac. 947, no one saw the unsuccessful appellant, or anyone else, steal the boom chains, but appellant came into possession of them and sold and delivered ten of them to one dealer, and twelve to another. There was evidence that an attempt had been made to destroy the brands on the chains by heating and hammering, and it was further shown that appellant had a blacksmith shop near the booming grounds from which the chains were taken. After his arrest, appellant told an officer that he knew the chains had been stolen, but

denied that he stole them. At the trial, he explained possession by testifying that the chains were brought to him by his half brother, and that he sold them for him and gave him the money.

Although the facts of the *Rathbun* case and the instant case differ widely, they, nevertheless, present a deadly parallel. In that case, the jury could find—but by inference only—that the appellant attempted to conceal the identity of the stolen property. In this case, that defendant attempted to conceal his own identity by writing a false name in the pawnbook is an admitted fact. In the *Rathbun* case, the appellant claimed he acquired possession of the chains from his half brother, a person who was presumably readily identifiable. In this case, the defendant described the individual from whom he claimed to have acquired possession as follows: "He was about 25 years old, 5 feet 5 inches tall, and about 140 pounds, dark brown skinned Negro."

Rathbun either lied when he told the officer that he knew the chains were stolen or when he testified in court that he did not know that they were stolen. In this case, the defendant either lied when he gave his address as "Fremon Hotel," in the pawnbook, or when he gave it, in his written statement, as the "Rex Hotel."

Again, in *State v. Salzman,* 176 Wash. 164, 28 P. (2d) 272, no one saw Salzman, or anyone else, take the horse from the farmer's barn in Douglas county, but it was proven that the appellant, who operated the Portland New and Second Hand Store in Chelan county, had possession of it shortly thereafter. On his appeal after conviction in the trial court, this court said:

"Salzman, testifying in his own behalf, said that he had purchased the horse from a man named Becker on April 5th; that he had bought it for the store, paying part cash and part merchandise. He took the following receipt from Becker:

"'April 5, 1931. Sold one black horse to Portland New and Second Hand Store. For sum of $67.50. Received merchandise of $46.25 by cash $21.25. H. R. Becker.'

"He did not remember having seen Becker before the

sale, and had not seen him since. He described Becker as blond in color, 'about five foot five and a half, something like that' in height, but could not remember anything further about him. E. S. Oei, on behalf of appellants, testified as to some conversation with the man alleged to have sold the horse, but was not present at the transaction. He had not known the man, whom he described as a big man, forty-five years old, and a tall man. Oei's testimony as to the stranger was as indefinite and inconclusive as that of Salzman. . . .

"We are of the opinion that the evidence was sufficient to sustain the jury's verdict as to appellant Salzman. He bases his contention as to the insufficiency of the evidence mainly upon his explanation of possession, and argues that his uncontradicted explanation destroys the force of any inference of guilt arising from his possession of the horse. But the jury were not required to accept his explanation. His possession of the horse and his explanation were to be weighed by the jury, with the other facts and circumstances of the case, in arriving at their verdict."

See, also, *State v. Bobinski,* 170 Wash. 120, 15 P. (2d) 691; *State v. Royce,* 38 Wash. 111, 80 Pac. 268; and *State v. Dotson,* 97 Wash. 607, 166 Pac. 769.

The order appealed from discontinuing the trial of this cause is reversed and set aside, and the cause remanded to the superior court of King county for further trial.

BEALS, C. J., BLAKE, JEFFERS, and CONNELLY, JJ., concur.