IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON
DIVISION THREE

| | | |
|---|---|---|
| STATE OF WASHINGTON, | ) | |
| | ) | No. 31502-9-III |
| Respondent, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| BENJAMIN EARL GARFIELD, | ) | UNPUBLISHED OPINION |
| | ) | |
| Appellant. | ) | |

FEARING, J. — A jury convicted Benjamin Garfield of one count of possession of a stolen firearm. On appeal, Garfield argues that the evidence was insufficient to prove that he knowingly possessed a stolen firearm. We agree. We reverse the conviction and direct the trial court to dismiss the charge.

## FACTS

The State of Washington accused Benjamin Garfield of possessing a stolen .30-06 Eddy Stone rifle. In November 2008, Grant County residents James and Kathleen Lecocq reported the theft of tools and guns, including the Eddy Stone rifle from their home. The State has never identified the thief.

In 2010 or 2011, Benjamin Garfield purchased a .30-06 Eddy Stone rifle from a Hispanic man at the Quik Stop in Quincy, Washington. Garfield first overheard the man unsuccessfully attempt to sell the rifle to three other men dressed in camouflage clothing. He approached the man and expressed interest in purchasing the rifle, after which the man took Garfield to his car and showed him the rifle in his trunk. The man told Garfield that he wished to sell the rifle for gas money to drive to Mexico. Garfield, then age 19, paid the man between $120 and $140 for the rifle.

On September 11, 2012, Benjamin Garfield pawned the Eddy Stone rifle for $75 to the Olde World Trading Company pawnshop in Ephrata. Garfield had previously pawned the same rifle to the Moses Lake Olde World Trading Company. When pawning the rifle in Ephrata, Garfield provided an Olde World employee with his full name, physical information, date of birth, driver's license number, a description of the rifle, and his current address. As required for any pawn transaction, Olde World Trading Company forwarded the rifle's serial number and description to the Ephrata Police Department. The serial number matched the Eddy Stone rifle stolen from the Lecocq residence.

The Ephrata Police Department determined that the Eddy Stone rifle was one of the guns reported stolen by James and Kathleen Lecocq in November 2008. Grant County Sheriff Deputy Michael Earney contacted Benjamin Garfield at his residence near George, in rural Grant County. Garfield explained to Earney that he bought the gun several years earlier from a man who needed money for gas, and Garfield volunteered

2

that he did not know the gun was stolen. Earney considered Garfield "more than cooperative" and Garfield agreed to speak with a detective. Report of Proceedings (RP) at 185. Garfield rode with Deputy Earney to the Ephrata police station for more questioning.

At the station, Benjamin Garfield repeated his story to Detective Todd Hufman, with whom he spoke for 36 minutes. Garfield again denied knowing the Eddy Stone rifle to be stolen. Garfield told Hufman that a Department of Fish and Wildlife agent investigated the gun's background during Garfield's hunting trip to Colockum Pass in November 2009. Garfield stated he was "pretty certain" the agent concluded the gun was not stolen. RP at 221. Later Garfield told Hufman he was only 70 to 75 percent sure that the agent researched the status of the .30-06 rifle.

Fish and Wildlife game warden Chad McGary testified at trial about a November 2009 encounter with Benjamin Garfield at Colockum Pass. McGary stopped the vehicle in which Garfield traveled to check to see if any gun inside the vehicle was loaded. McGary could not remember if he checked the status of the Eddy Stone rifle, although he routinely checks on all firearms he encounters on patrol. He could not remember ever seeing any Eddy Stone rifle on a hunter. If his research finds a gun to be stolen, registered to someone else, or involved in a legal violation, he issues a citation and generates a report. Agent McGary created a report from his encounter with Garfield, not because he discovered a stolen weapon, but because he cited Garfield for possession of

3

marijuana and use of drug paraphernalia. The trial court granted Garfield's motion in limine to exclude the drug-related information from trial.

PROCEDURE

The State of Washington charged Benjamin Garfield with one count of possession of a stolen firearm in violation of RCW 9A.56.310, a class B felony. During closing argument, the State pointed to Benjamin Garfield's inconsistent statements regarding the review of the Eddy Stone rifle by the game warden and Garfield's inability to identify the year he purchased the gun. In his closing statement, Garfield explained that the events occurred years before and his misremembering of details is not evidence that he knew the gun was stolen.

The jury found Benjamin Garfield guilty.

LAW AND ANALYSIS

RCW 9A.56.310, under which the State charged Benjamin Garfield, reads, in relevant part:

> (1) A person is guilty of possessing a stolen firearm if he or she possesses, carries, delivers, sells, or is in control of a stolen firearm.
> . . . .
> (4) The definition of "possessing stolen property" and the defense allowed against the prosecution for possessing stolen property under RCW 9A.56.140 shall apply to the crime of possessing a stolen firearm.

RCW 9A.56.140 provides, in turn:

> (1) "Possessing stolen property" means knowingly to receive, retain, possess, conceal, or dispose of stolen property knowing that it has been

4

stolen and to withhold or appropriate the same to the use of any person other than the true owner or person entitled thereto.

(2) The fact that the person who stole the property has not been convicted, apprehended, or identified is not a defense to a charge of possessing stolen property.

Under the modern criminal code, the crime of possession of stolen property is separated from theft and is found in RCW 9A.56.140 through .170. There is no theft component to the crime and it is no longer categorized as larceny. *State v. Hawkins*, 157 Wn. App. 739, 749, 238 P.3d 1226 (2010). The essence of the crime is possession of stolen property, knowing it to be stolen. RCW 9A.56.140(1). The State need not prove actual knowledge. It is satisfactory to show the accused knew facts sufficient to put him on notice that the property was stolen. *State v. Rockett*, 6 Wn. App. 399, 402, 493 P.2d 321 (1972); *State v. Rye*, 2 Wn. App. 920, 471 P.2d 96 (1970).

Benjamin Garfield contends the State failed to prove knowledge. To resolve this contention we review principles of sufficiency of evidence and case law of possession of stolen personal property.

Evidence is sufficient if, after viewing it in the light most favorable to the State, a rational trier of fact could find each element of the crime beyond a reasonable doubt. *State v. Green*, 94 Wn.2d 216, 221-22, 616 P.2d 628 (1980); *see also State v. Witherspoon*, 180 Wn.2d 875, 883, 329 P.3d 888 (2014). A defendant challenging sufficiency of the evidence at trial admits the truth of the State's evidence and all reasonable inferences therefrom. *Witherspoon*, 180 Wn.2d at 883. This court defers to

5

the fact finder's determination of the persuasiveness of the evidence. *State v. Davis*, 176 Wn. App. 849, 861, 315 P.3d 1105 (2013), *rev'd on other grounds*, No. 89448-5, slip op. (Wash. Dec. 24, 2014). A verdict may be supported by either circumstantial or direct evidence, as both may be equally reliable. *State v. Brooks*, 45 Wn. App. 824, 826, 727 P.2d 988 (1986).

A jury may draw inferences from evidence so long as those inferences are rationally related to the proven facts. *State v. Jackson*, 112 Wn.2d 867, 875, 774 P.2d 1211 (1989). A rational connection must exist between the initial fact proven and the further fact presumed. *Jackson*, 112 Wn.2d at 875. An inference should not arise when other reasonable conclusions follow from the circumstances. *State v. Bencivenga*, 137 Wn.2d 703, 711, 974 P.2d 832 (1999). The jury may infer from one fact the existence of another essential to guilt, if reason and experience support the inference. *Tot v. United States*, 319 U.S. 463, 467, 63 S. Ct. 1241, 87 L. Ed. 1519 (1943). Nevertheless, essential proofs of guilt cannot be supplied by a pyramiding of inferences. *State v. Bencivenga*, 137 Wn.2d at 711; *State v. Weaver*, 60 Wn.2d 87, 89, 371 P.2d 1006 (1962).

Benjamin Garfield argues a jury could not reasonably infer that he had actual or constructive knowledge that the rifle was stolen for numerous reasons: (1) the Lecocqs reported the theft several years before he pawned the rifle; (2) the State presented no evidence that Garfield was familiar with the location of the theft; (3) the price at which he purchased the rifle was not unreasonably low; and (4) the State introduced no direct

6

evidence of "guilty knowledge" on his part. The State responds that the jury could reasonably infer that the circumstances under which Garfield purchased the rifle put him on constructive notice that the rifle was stolen. Those circumstances include: (1) Garfield's purchase of the rifle from a man at a gas station, (2) the seller retrieving the gun from the trunk of the car, (3) Garfield's lack of a receipt for the purchase of the rifle, and (4) Garfield's revision of answers he gave the Ephrata police. The State does not identify purchasing the gun from a Hispanic man wanting gas money for a trip to Mexico as a relevant circumstance. Nor does the State rely on the age of Benjamin Garfield.

Washington case law assists in determining what facts are rationally related to a finding of constructive knowledge of stolen goods. Mere possession of stolen property is not enough to justify a conviction. *State v. Couet*, 71 Wn.2d 773, 775, 430 P.2d 974 (1967); *State v. Withers*, 8 Wn. App. 123, 128, 504 P.2d 1151 (1972). If a defendant possesses recently stolen property, usually from a few hours to a few months, slight corroborative evidence of other inculpatory circumstances tending to show guilt will allow a trier of fact to infer that the defendant had constructive knowledge of the theft. *State v. Portee*, 25 Wn.2d 246, 254-55, 170 P.2d 326 (1946); *State v. McPhee*, 156 Wn. App. 44, 62, 230 P.3d 284 (2010); *State v. Withers*, 8 Wn. App. at 128. Possession of a recently stolen item is strong evidence that a defendant either knew it to be stolen or participated in the theft. *Portee*, 25 Wn.2d at 253 (citing 1 WHARTON'S CRIMINAL EVIDENCE, 11th ed., 198, § 191).

7

No Washington decision establishes a dividing line between a recent theft and an old or earlier theft. At least 13 months, and likely more time, passed between the time of the theft of the Eddy Stone rifle and Benjamin Garfield's purchase of the rifle. Three years and 10 months elapsed between the theft and Garfield pawning the rifle. None of Washington's reported decisions show the accused gaining possession of the stolen property more than several months after the theft.

A conflicting or unreliable story of how the defendant came into possession of the stolen property may provide slight corroborative evidence. *State v. Ladely*, 82 Wn.2d 172, 175, 509 P.2d 658 (1973); *State v. Douglas*, 71 Wn.2d 303, 307, 428 P.2d 535 (1967); *State v. Mevis*, 53 Wn.2d 377, 381, 333 P.2d 1095 (1959); *State v. Pisauro*, 14 Wn. App. 217, 221, 540 P.2d 447 (1975); *State v. Beck*, 4 Wn. App. 306, 310, 480 P.2d 803 (1971). Behavior indicating guilty knowledge may inculpate a defendant, such as: giving a fictitious name to a potential buyer of the stolen goods, *State v. Tollett*, 71 Wn.2d 806, 810, 431 P.2d 168 (1967); having a past history of transactions involving stolen goods, *State v. Hatch*, 4 Wn. App. 691, 693, 483 P.2d 864 (1971); or hiding the stolen property. *McPhee*, 156 Wn. App. at 63.

The State presented no such evidence against Benjamin Garfield. Reading the evidence in a glow most favorable to the State, Garfield presented an inconsistent story about an encounter with a game warden, but offered only a mildly inconsistent story about the purchase of the rifle. He gave his correct name and other personal information

8

to a pawnshop and never hid the gun. He did not mar the serial number on the firearm. The State presented no history of Garfield handling stolen property.

A defendant's knowledge of, or proximity to, the place from which the property was recently stolen can corroborate a charge of possession of stolen property. *State v. Killingsworth*, 166 Wn. App. 283, 288, 269 P.3d 1064, *review denied*, 174 Wn.2d 1007, 278 P.3d 1112 (2012); *McPhee*, 156 Wn. App. at 63. So too can purchasing or selling the stolen property at an unreasonably low price. *See State v. Smyth*, 7 Wn. App. 50, 53, 499 P.2d 63 (1972). The State did not present evidence of the proximity between the Quik Stop station and the Lecocq home, other than both are in the same county. The State presented no testimony of Benjamin Garfield having familiarity with the location of the Lecocq home, or that Garfield purchased the Eddy Stone rifle at a price below its value.

We are reluctant to overturn a jury verdict of guilt. Therefore, we review many Washington decisions in order to discern parameters for evidence relevant to proving knowingly possessing stolen property and to understand what inferences might be drawn from the evidence. We review the cases in chronological order.

In *State v. Rathbun*, 139 Wash. 502, 247 P. 947 (1926), no one saw anyone steal the subject boom chains. Merton Rathbun acquired them and sold 10 chains to one dealer and 12 to another. Someone attempted to destroy the brands on the chains by heating and hammering. Rathbun owned a blacksmith shop near the booming grounds from which the chains were taken. After his arrest, Rathbun told an officer that he knew the chains

9

had been stolen, but denied that he stole them. At trial, he testified he had no knowledge of the chains being stolen. The Supreme Court affirmed Rathbun's conviction.

In *State v. Portee*, 25 Wn.2d 246, 170 P.2d 326 (1946), the State appealed the trial court's dismissal of the case after the conclusion of the State's evidence. Jeanette Pahl arrived in Seattle by train and left eight pieces of baggage in storage at the railroad depot for delivery to her home later by a transfer company. Four days later the transfer company delivered the baggage, with a suitcase missing, to Pahl's home. The company's loading dock was accessible to persons other than its employees. Two days later police arrested Henry Portee on an unrelated charge. Police grabbed a pawn ticket found among Portee's personal effects. The ticket indicated that Portee pawned a suitcase at the Empire Loan Company the same day that the transfer company delivered the baggage to Pahl. Pahl identified the article represented by the pawn ticket as her missing suitcase. The gentleman who pawned the suitcase signed his name on the pawnshop records as "Jame Hermon," whose address was "Fremon Hotel." Portee claimed he purchased the suitcase from a man in a tavern for $4. The pawnshop owner testified the case's value to be $40. The trial court dismissed the charges, while commenting that the State only provided evidence of Portee's possession of the suitcase. The Supreme Court agreed that a long series of Washington decisions supported the proposition that possession of stolen goods alone is insufficient. Possession must be personal, recent, and unexplained, and must involve a distinct and conscious assertion of property by the defendant. The

10

inference is stronger if the explanation involves use of a false identity or other fabricated evidence. The Supreme Court concluded that the State established facts beyond mere possession. Portee pawned the suitcase the same day as its theft. He gave a fictitious name and a false address at the pawnshop. The Supreme Court reversed the dismissal of charges and remanded for a new trial.

In *State v. Razey*, 54 Wn.2d 422, 341 P.2d 149 (1959), Stanley Razey and three other prisoners at the Adams County jail escaped the jail by attacking the deputy sheriff Marvin Collier, locking him in a jail cell, and relieving him of $400. Within hours of the jailbreak, someone stole a 1958 Buick automobile from Rogel Motor Company located across the street from the jail. Later that night, a law enforcement officer stopped the Buick. Two of the prisoners sat in the front seat and Razey sat in the backseat. The arresting officers relieved the other prisoners of a total sum of $394. Razey had no money on his person. At trial, Deputy Collier testified that two of the prisoners stuck a respective hand in his pockets but he could not identify which of the two did so. Since Collier was unable to testify whether Razey hit him or whether Razey stuck his hands in Collier's pocket, the Supreme Court reversed convictions against Razey for robbery and assault. The State urged that the circumstances proved in this case strongly indicated that the three men engaged in a concerted effort. The Supreme Court agreed with this argument as to possessing the stolen Buick, but not the money. In addition to being inside the car and in possession of the car, Razey was in the vicinity of Rogel Motor

11

Company at a time during which the burglary could have been committed, and was inside the car minutes after the jail escape.

In *State v. Tollett*, 71 Wn.2d 806, 431 P.2d 168 (1967), someone forcibly entered a construction shed and took a Homelite chain saw, electric drill, electric skill saw, chain, and a hoist. Henry Tollett sold the tools to Ralph Morton the following day for $60. The value of the tools was between $112 and $300. When questioned by police, Tollett provided a fictitious name. The Supreme Court held the evidence justified a finding of guilty knowledge on the part of Tollett.

In *State v. Rye*, 2 Wn. App. 920, 921, 471 P.2d 96 (1970), thieves ransacked Harry Martin's Longview home, while he vacationed in Hawaii, and stole many personal belongings. A police search of Neuman Rye's Longview home in May of the same year uncovered the items taken from Martin's house, including men's suits with Harry Martin's name inside, sweaters, white shirts, women's furs, dresses, purses, jewelry, a mink coat, bedspread, a floor polisher, coffee urn, hair dryer, and candlestick holders. Rye claimed he was only storing these articles for Mr. Wettle. Evidence showed Wettle was a close friend of Rye and a former cellmate for 18 months at the Walla Walla State Penitentiary. Rye knew that Wettle had been convicted of four burglaries. According to Rye, Wettle told Rye that Wettle purchased the goods from a pawnshop in California and that he wanted Rye to store them. This court considered Wettle's account so unusual that a reasonable person would have been put on notice of the goods being stolen. The goods

12

were not the type found in a pawnshop. Instead of storing the goods, Rye placed the candlestick holders on the mantle in his home. He placed the jewelry on the dressing table in his bedroom and applied the bedspread to his bed. Rye wore some of the dress shirts and stored them in his dresser drawers. This court also deemed the jury could question Neuman Rye's credibility in view of his five earlier convictions for burglary.

In *State v. Beck*, 4 Wn. App. 306, 480 P.2d 803 (1971), someone lifted copper and brass wire from the Atlas Mine and Mill Supply Company on November 26, 1968. On the same day, Michael Beck and William Luckenbill sold the wire, after its covering was burned, to Pacific Hide and Fur Company in Spokane. One of the young men signed the name "Ron Jacobson" on an invoice, together with the address "1923 South Freya," which did not exist. A law enforcement officer traveled to the Luckenbill's home, and with permission of Luckenbill's mother, took samples of partially burned electric cable wire from the site of a backyard bonfire. The remnants were comparable to the stolen wire. Michael Beck denied any involvement in the theft or sale of the wire. He argued a lack of evidence linking him to the theft of the wire. He contended that his mere presence with Luckenbill at the time of sale to Pacific Hide was insufficient to establish him as a possessor of stolen goods. Beck testified Lukenbill and he were in Coulee City with his uncle on November 26, 1968. To the contrary, cross-examination indicated they were in Coulee City the evening before or evening of November 27 or 28. This court concluded that Beck's false alibi and evidence of his presence at the time of sale created

13

sufficient indicatory points to justify submission of the question of Beck's guilt to the jury. We mentioned that there might have been insufficient evidence had Beck not testified.

In *State v. Hatch*, 4 Wn. App. 691, 483 P.2d 864 (1971), police found, at Marvin Hatch's business, shakes stolen from a shingle mill on the previous day. Hatch told the arresting officer he bought the shakes from a man whose name he could not remember. Investigating officers made plaster casts of tire impressions found at the victimized shingle mill. The casts matched plaster casts from Hatch's truck. Someone affixed another manufacturer's label to some of the bundles of shakes traced to Hatch. Evidence was admitted that Hatch had sold shakes and shingles similarly mislabeled. This court ruled sufficient evidence supported the guilty verdict against Hatch.

In *State v. Smyth*, 7 Wn. App. 50, 499 P.2d 63 (1972), Elaine Hughes, Charles Smyth's mother-in-law, observed stereo equipment in Smyth's residence, and, knowing he lacked money, suspected that he possessed the equipment illegally. Hughes gave a close description of other items in Smyth's possession to a law enforcement officer that matched property recently reported as stolen. At trial, Smyth testified that he purchased the stereo equipment for $200 from Ed Ross. Smyth stated he met Ross in a tavern, Ross was being evicted from his apartment, and Ross wished to sell the equipment so that he could return to California. Smyth admitted the equipment was worth well in excess of $200 and also testified that he received a bill of sale, but had lost it. He admitted that he

14

visited two or three times the residence from which the equipment was stolen. Hughes testified that she found and read a letter handed to her by her daughter, Smyth's wife, that Smyth wrote while in jail, in which he expressed a desire for a bill of sale for the equipment. Harold Sheridan, a friend of Smyth, testified that he and Smyth's wife traveled to obtain a fictitious bill of sale. This court did not address the sufficiency of the evidence for a conviction, but reversed because of the trial court's refusal to instruct the jury on the defense of open appropriation of the goods under a claim of title.

In *State v. Withers*, 8 Wn. App. 123, 504 P.2d 1151 (1972), this court affirmed a conviction for possession of stolen goods. In September 1970, someone pilfered many items from the freighter, *Don Jose Figueras*, while the freighter docked in the Port Angeles harbor. Weston Withers worked as a longshoreman at the harbor. In October 1970, Withers sold, from his house and a car at the harbor, a large quantity of new sweaters, jackets, shirts, transistor radios and inflatable vinyl furniture to residents of the area, all of which the freighter had transported. One buyer purchased a huge box of new clothing from Withers on credit. Another buyer purchased $70 worth of goods for $38 from Withers at the harbor dock.

The closest case on point is *State v. Ladely*, 82 Wn.2d 172, 509 P.2d 658 (1973), where police discovered a stolen revolver in the home of David Ladely after responding to a call from Ladely claiming his home was burglarized. The owner of the revolver reported it stolen three years earlier. After determining the revolver was stolen, law

enforcement returned to Ladely's home with a search warrant and found other stolen items, including a film checked out from the public library with the gun theft victim's library card. Ladely told three different stories about how he came into possession of the stolen revolver. Despite the long period of time elapsing between the theft of the revolver and Ladely's possession of it, the Washington Supreme Court found sufficient evidence that Ladely knew the item was stolen.

In *State v. McPhee*, 156 Wn. App. 44, 230 P.3d 284 (2010), the State charged Jeffrey McPhee with possessing a stolen Weatherby rifle, Benelli shotgun, Remington shotgun, Enfield rifle, field binoculars and ivory tusks. Ronald Miller returned from an overnight trip on January 29, 2007, to discover his home had been burgled and the items stolen. Two days after the theft, Jeffrey McPhee contacted Nicholas Herrick to ask if he was interested in buying a gun. Herrick took possession of the Weatherby rifle, and subsequently delivered it to the sheriff's office. Herrick informed Jeremy Baker that McPhee had some guns for sale. Baker met with McPhee on the same day that McPhee met with Herrick, and told McPhee he was interested in purchasing the Benelli shotgun for a couple hundred dollars. He took the Benelli shotgun into his possession that day. Jeffrey McPhee contacted Steve Neva in early February 2007 and asked if he was interested in purchasing guns. Neva and McPhee previously worked together at a job site next to Miller's residence. While working on that site, McPhee went to Miller's residence to use the electrical power. One week before McPhee contacted him about

16

purchasing guns, McPhee asked to borrow Neva's truck to "unload a house."
Meanwhile, Miller placed an advertisement in the local newspaper, in which he listed the
missing items and offered a $500 reward for their return. A few days later, David Kochis
contacted Miller about the missing items. After speaking with Kochis, Miller contacted
his old friends, Neva and Dale McGinnis, to help him recover the stolen property. Neva,
McGinnis, Kochis, and another man went to confront McPhee at McPhee's girlfriend's
residence on the morning of February 9, 2007. McPhee led the group to some brush,
under which lay the guns, the tusks, and the binoculars. Police arrested McPhee. While
in custody, McPhee told one officer that he knew he was in a lot of trouble and he wanted
to cooperate. He explained that he obtained the guns in a nearby town from a guy named
Bill. McPhee said he told Bill about a house on the bay with a big screen television and
some guns. Bill later approached McPhee to ask if he was interested in purchasing some
guns, binoculars, and tusks. McPhee bought all of the guns, binoculars, and tusks for
$100. McPhee told the officer that he considered the low price unusual but that he
believed Bill needed quick cash. At trial, McPhee claimed to have first learned the
property was stolen on February 9. He explained that he placed the items in the brush on
his friend's property for safe keeping, despite being aware that the guns would be
exposed to the elements. Surprisingly, a first jury acquitted McPhee of two counts of
possession of stolen firearms for the Weatherby rifle and the Benelli shotgun. A second

17

jury convicted McPhee on possessing other stolen items. Not surprisingly, the Court of Appeals affirmed the convictions.

The evidence against Benjamin Garfield falls short of evidence against all of the accused in the reviewed Washington decisions. *Ladely*, which includes the most analogs, contains significant differences to the prosecution of Benjamin Garfield. Law enforcement found no other stolen goods in Garfield's custody and Garfield never changed his story about how he acquired the rifle. The State did not show that Garfield knew the Lecocqs or was familiar with their residence. Benjamin Garfield had in his control only one item stolen from the Lecocq home. Other than the accused in *Ladely*, all other accused held possession of the stolen goods within weeks of their theft and under suspicious circumstances.

Washington reports contain numerous other decisions addressing the sufficiency of evidence in charges for possessing stolen property. None of the other decisions supports a finding of constructive knowledge in Benjamin Garfield of the Eddy Stone rifle's stolen status.

The State emphasizes the fact that Garfield "changed" his story about whether or not the Eddy Stone rifle had been checked by a Fish and Wildlife officer and "come back clear," and the number of guns he owned. RP at 210. The State forwards no rational connection between these facts and constructive knowledge that the rifle was stolen. Assuming Garfield gave inconsistent stories, the subject matter did not concern the

18

circumstances under which he gained possession of the Eddy Stone rifle.

We are mindful of the Latin maxim "falsus in uno, falsus in omnibus," meaning false in one, false in all. The jury, if satisfied that a witness testified falsely in any particular, might disregard all of the testimony of such witness except as it was corroborated by other evidence in the case. *Maytown Lumber Co. v. Maytown Mill Co.*, 136 Wash. 534, 537, 240 P. 902 (1925). The State might argue that, since Benjamin Garfield told a fib about a game warden investigating the status of the rifle, the jury could conclude the story regarding the purchase of the rifle to also be untrue. Nevertheless, we are also mindful of the well-settled rule that a witness cannot be impeached by showing the falsity of his testimony concerning facts collateral to the issues. *State v. Taylor*, 39 Wn.2d 751, 754, 238 P.2d 1189 (1951). Benjamin Garfield's report to the police officers of the encounter with the game warden is collateral, and any change in his story was minimal. He first said the warden reviewed the status of the rifle and later said he was 75 percent sure of the warden checking the rifle's status. This minimal difference does not render it more likely that Benjamin Garfield knew the Eddy Stone rifle was stolen.

Another problem arises in the State's use of the purported inconsistent statement of Benjamin Garfield. Although the game warden testified he had not seen an Eddy Stone rifle used by a hunter before, the game warden never denied that he checked the stolen status of the gun. Warden McGary could not remember if he checked the status of the Eddy Stone rifle, although he routinely checks on all firearms he encounters on patrol.

If his research finds a gun to be stolen, registered to someone else, or involved in a legal violation, he issues a citation and generates a report. He never reported the Eddy Stone rifle as stolen.

The State emphasizes that Benjamin Garfield did not follow the procedures that society imposes on one who purchases a gun and uses these purported facts as circumstantial evidence that Garfield knew the gun was stolen. Nevertheless, the State does not identify the procedures Garfield should have followed. If he violated any such law, the State should have identified the law, if not prosecuted Garfield under the law.

To our knowledge, Benjamin Garfield broke no laws when he purchased the rifle from a private individual. The minimum age for purchase or possession of a firearm is 18 years old. RCW 9.41.040(2)(a)(iv). Garfield was 19 when he purchased the rifle. Washington State did not require, at either the time Garfield purchased the rifle or at the time of his arrest, that the firearm purchase be registered with a state or federal authority. *See* WASHINGTON STATE DEP'T OF LICENSING, http://www.dol.wa.gov/business/firearms/firchart.html (last visited Nov. 5, 2014).

Benjamin Garfield would have had to submit to a background check before purchasing the rifle, if the person from whom he purchased the rifle was a dealer. RCW 9.41.090. A "dealer" for the purpose of Washington's firearm laws is:

> a person engaged in the business of selling firearms at wholesale or retail who has, or is required to have, a federal firearms license under 18 U.S.C. Sec. 923(a). A person who does not have, and is not required to

20

have, a federal firearms license under 18 U.S.C. Sec. 923(a), is not a dealer if that person makes only occasional sales, exchanges, or purchases of firearms for the enhancement of a personal collection or for a hobby, or sells all or part of his or her personal collection of firearms.

RCW 9.41.010(4). The State provided no evidence that the person from whom Garfield purchased the rifle qualified as a dealer.

Rifles are exempt from Washington's concealed pistol license requirements. *See generally* RCW 9.41.070, .073, .075. A "pistol" is "any firearm with a barrel less than sixteen inches in length, or is designed to be held and fired by the use of a single hand." RCW 9.41.010(15). The State did not claim the Eddy Stone firearm was a pistol. Therefore, Garfield was under no obligation to obtain a permit for the concealed possession of his rifle. In short, contrary to the State's contention, Washington State had no formal purchase or registration procedures in place for private sales at the time that Benjamin Garfield purchased and possessed the rifle.

The State also focuses on the seller having retrieved the gun from a car trunk. The State shows no logical connection between the storage location of the gun and it being stolen. The seller stated he was on his way to Mexico and placement of the gun in the trunk is as logical as any other spot for storing the gun.

In this criminal prosecution, the evidence must be sufficient to establish the crime beyond a reasonable doubt, not just a preponderance of the evidence. No Washington decision discusses this question, but we assume the evidence in a criminal case must be

21

stronger to survive a motion to dismiss than to survive a summary judgment motion in a civil suit.

When excluding the facts unrelated to knowledge that the rifle was stolen, we are left with mere possession of a stolen gun. In essence, the State posits that anyone who purchases a firearm other than at a flea market, at a garage sale, from a friend, or from a "reputable business," can be convicted of possession of a stolen firearm, if the firearm was stolen prior to his coming into possession of it. Case law does not support this proposition. None of the facts described in Washington decisions as indicia of knowledge of stolen property is present here. There is no smoking gun.

If the reviewing court finds insufficient evidence to prove the elements of the crime charged, reversal is required. *State v. Bailey*, 67 Wash. 336, 342, 121 P. 821 (1912). We dismiss the charge of possession of stolen property filed against Benjamin Garfield.

A majority of the panel has determined this opinion will not be printed in the Washington Appellate Reports, but it will be filed for public record pursuant to RCW 2.06.040.

_____
Fearing, J.

WE CONCUR:

_____                    _____
Siddoway, C.J.                                      Korsmo, J.

22